## STEVENS *v.* SEHER.

---

PATENTS; RECORD ON APPEAL; COSTS; INTERFERENCES; PRELIMINARY STATEMENT, AMENDMENT OF; REDUCTION TO PRACTICE; DESCRIPTION IN PATENT.

1. Where on appeal from a decision of the Commissioner of Patents a record was allowed to be filed in the case by appellee upon assurance that it would have some material bearing upon the question of the issue presented by the appellee, but on consideration it was found that the record had no such

bearing, *held*, that the record so introduced must be at the cost of the appellee.

2. It is of the utmost importance that strictness be observed as to the dates furnished in preliminary statements required in cases of interferences, for if parties were allowed to vary their dates at pleasure as to the time of discovery, invention, or disclosure, it would inevitably lead to the imputation of deception and bad faith practiced on the part of the party so changing his dates.

3. If any material error occurs in the preliminary statements, or other statements made to the office, through inadvertence or mistake, the statement may be corrected on motion upon showing to the satisfaction of the Commissioners that the correction is essential to the ends of justice, and the motion to correct the statement must be made, if possible, before the taking of any testimony and as soon as practicable after the discovery of the error. It is only upon complying with this rule that the correction of any material error in preliminary statements can be made.

4. On the proof, *held*, that the claim of Seher is not sufficiently and definitely established to maintain his patent, it having, as it can have, only *prima facie* effect; that he has failed to show that he has fully and completely established by experimental tests so as to enable persons reasonably skilled in the science of chemistry to determine whether or not the composition made and claimed by him as new and valuable in the arts really possesses those properties which he claims as the essential character as an operative means, for no invention or discovery in such case as the present can be regarded as complete until such tests have been applied and have been successfully maintained.

5. In a case like the present the patent should state and fully disclose the component parts of the composition claimed with clearness and precision and not leave a person attempting to use the discovery to find it out by experiment. If the description be so vague and uncertain that no one can tell with certainty, except by independent experiment, how to apply the discovery and what exact result may be expected therefrom, the patent is void.

6. The decision of the Acting Commissioner of Patents in awarding priority to Seher *reversed*.

No. 54. Patent Appeals. Submitted January 14, 1897. Decided October 4, 1897.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding between an applicant and a prior patentee. *Reversed*.

The facts are sufficiently stated in the opinion.

*Messrs. Betts, Hyde & Betts* for the appellants.

*Mr. Anthony Gref* and *Mr. Edwin H. Brown* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This case is brought here by an appeal from the Commissioner of Patents. The appeal is taken by John H. Stevens and the Celluloid Company, as assignee, from the decision of the Acting Commissioner of Patents in a matter of alleged interference of the claim of the appellant Stevens with an existing patent granted to the appellee, August Seher, relating to certain solvents of pyroxyline. The issue of the interference, as defined in the Patent Office, is as follows:

"A pyroxyline compound consisting of pyroxyline and one or more members of the group of herein-described ketone solvents."

This issue constitutes the second claim of the appellant and involves his first claim, as made in his specifications, and it also involves the first and second claims of an application of Walter D. Field for a patent for pyroxyline solution or compound, and the claim in Patent No. 470,451, granted to August Seher, the appellee, for the manufacture of compounds of pyroxyline.

The Field claim is not involved on this appeal. There was no attempt to support that claim to priority by proof, and Field has not joined in this appeal and has not had his record printed. His claim must therefore be considered as withdrawn, at least so far as this appeal is concerned. The record of the case of Field's application was, upon the motion of Seher, the appellee, allowed to be filed in this case, upon the assurance of counsel that it would appear to have some material bearing upon the question of the issue presented by this appeal; but that record would seem to have no material

relation to the question here involved, and the record thus introduced must therefore be at the cost of the appellee.

Before proceeding to consider the main question of the appeal, that of priority of discovery, there is a question of practice of the Patent Office presented and insisted upon that is proper to be noticed, because of its great importance, as it may affect the integrity and good faith of the proceedings of the Patent Office and the interest of the public.

To state fully this question of practice, it may be proper to state the course of proceeding as it occurred in the Patent Office in this case, and this can be best done by stating such course of proceeding in the language of the Acting Commissioner of Patents. He says, in the final opinion in that office, stating the facts of the case, that—

"The interference was originally declared July 25, 1892, between the application of Stevens and the patent of Seher. The time for filing preliminary statements was fixed for August 16, 1892. Stevens filed a statement August 6, 1892, and Seher August 15, 1892. Both statements were opened August 20, 1892, and both were immediately sealed against inspection, and on August 22, 1892, a letter was written to each party calling for an amended preliminary statement, in view of certain defects in the original, on or before September 7, 1892. On that day Seher filed an amended statement. On September 10, 1892, Seher's second statement was opened and immediately sealed against inspection, and a letter calling for an additional amended statement and extending the time for filing such statement to September 28, 1892, was sent to Seher. On the same day another letter was sent to Stevens, notifying him of that extension. September 16, 1892, the primary examiner requested a suspension of the interference for the purpose of adding a new party—Field. The interference was suspended September 17, 1892, and redeclared October 7, 1892. The time for filing statements was fixed in the new notices for November

2, 1892. Seher and Field filed their statements November 1, and Stevens filed no further statement, but relied upon the one filed August 6, notwithstanding the objections made to it by the examiner of interferences and the restrictions which, in view of such objections, it imposed upon him (Stevens) as to the date of conception and disclosure. In his first and second statements Seher gave as the date of his disclosure September 15, 1890. In his third statement the date of disclosure was given as 'on or about the 15th day of August, 1889.' Stevens was restricted by the examiner of interferences to January, 1890, as to conception and disclosure.

"Counsel for Stevens contends that Seher should be restricted to September 15, 1890, as the date of his disclosure, and a motion to strike out Seher's third statement was made by Stevens at the hearing, notice of his intention to make such motion having been given orally before the taking of any testimony, and also on March 13, 1895, in writing. He states in his brief that 'it does not seem equitable or just that he (Seher) should be allowed to alter these dates and make a difference of nearly a year in his favor in his third statement after he or his attorneys or his attorneys' correspondents in Washington had an opportunity of inspecting the preliminary statement of his adversary, and there is nothing in the testimony to repel the presumption that when the third preliminary statement of Seher's was filed he or his attorneys had at least some information of the dates given by Stevens in his preliminary statement.'

"Seher contends that the motion should not be entertained, because he gave notice to Stevens that unless such motion was brought before any testimony was taken he would consider the objection to his third statement waived. His attorney has also stated that at the time he first discovered the error in his first and second statements the interference had been suspended, and that he could not therefore bring a motion to correct such error, and that when another party was added the interference became a new interference. His

third contention is that 'neither Seher nor . . . any one in any way connected with Seher had any knowledge or information whatsoever of the contents of Stevens' preliminary statement.'

"The examiner of interferences adjudicated priority in favor of Stevens, and stated in his decision that 'the conclusion herein reached renders it unnecessary to pass upon Stevens' motion to strike out the third preliminary statement filed by Seher.'" "This," says the Acting Commissioner, "would have been good practice had the examiner of interferences been the final tribunal, but under the circumstances it would have been better to have passed that motion. The examiners-in-chief sustained the examiner of interferences, and hence there was no direct need for them to consider this question, and in fact their decision contains no reference to it. There may be no necessity for the Commissioner to decide the question, and again it may be of vital importance; for, if admitted, the statement changes the chronological relation of Seher and Stevens as to alleged disclosure. The best and strictest practice," says the Acting Commissioner, "would require me to remand the case to the examiner of interferences for consideration of this question, with permission for the usual recourse by appeal, and Seher's counsel should then have insisted upon the determination of this question by the examiner of interferences before his first appeal. The examiners-in-chief, if they had considered the question one over which they had jurisdiction, might have remanded the case before their decision. Since, however, Stevens' motion was brought too late (Rule 113), and since at no time prior to the approval of the final statements of the three parties was the statement of either of the others open to any of them under Rule 108, I shall admit Seher's third statement without remanding the case back to the examiner of interferences."

It thus appears that both the examiner of interferences and the board of examiners-in-chief decided the question

of priority in favor of Stevens, without regard to the change of date of disclosure set up by Seher in his third preliminary statement, interjected into the case without authority. These two tribunals did not regard the change of date as being material in passing upon the question of priority, and hence they attached no importance to it.

Treating the new date insisted upon by Seher as properly in the case, they decided against him upon the facts in the case; but on appeal to the Commissioner, and when a different view of the facts was taken, the question of the change of dates in the preliminary statement of Seher became of prime importance. It was then that the right of Stevens under his motion to strike out the third preliminary statement of Seher became material to be considered; but that motion the Acting Commissioner overruled, and admitted Seher's third statement without remanding the case back to the examiner of interferences; and in thus ruling we think the Acting Commissioner erred, and if there was nothing else in the case on which to predicate error, we should reverse the decision and remand the case, that regular proceeding should be observed and maintained. It is of the utmost importance that strictness be observed as to the dates furnished in preliminary statements required in cases of interferences, for if parties were allowed to vary their dates at pleasure as to the time of discovery, invention, or disclosure, it would inevitably lead to the imputation of deception and bad faith practiced on the part of the party so changing his dates. If any material error occurs in the preliminary statements made to the office, *through inadvertence or mistake,* the statement may be corrected on motion, *upon showing to the satisfaction of the Commissioner that the correction is essential to the ends of justice;* and the motion to correct the statement must be made, if possible, before the taking of any testimony, and as soon as practicable after the discovery of the error. (Rule P. O. 113.) It is only upon complying with this rule that the correction of any material error in pre-

liminary statements can be made. That rule was wholly ignored in this case in respect to the third statement of Seher.

But there is other ground for the reversal of the decision appealed from, besides the matter of practice just referred to, involving the merits of the case.

The application of Seher, upon which his patent issued was filed December 23, 1891, and the patent thereon was issued March 8, 1892. The discovery for which the patent issued is described therein as, first, that certain ketones described are individual solvents of pyroxyline; second, that a mixture of any two or more of them is a solvent of pyroxyline; and, third, that a mixture of any one of them with any then known direct or indirect solvent of pyroxyline is a solvent of pyroxyline. The claim, as broadly asserted by the patent, is as for "an improvement in the manufacture of pyroxyline or nitrocellulose, the solvents propion, butyron, valeron, caprone, methyl-ethyl ketone (acetyl-ethyl), methyl-propyl ketone, methyl-butyl ketone, methyl-valeral, ethyl-butyl ketone, and methyl-amyl ketone, as and in the manner specified."

The application of Stevens was filed May 11, 1892, more than two months after the issue of the patent to Seher; but the specifications of Stevens would appear fully to cover the alleged discovery described in Seher's patent; and we may suppose that the specifications of Stevens were intended to raise an issue of interference with that patent.

In his application Stevens states that his improvements are applicable to the manufacture of the entire class of materials which are well known in trade as pyroxyline compounds; and the distinctive novelty of his invention or discovery he states to be the employment, in combination with pyroxyline, of *certain substances which he had discovered to possess the property of dissolving or of aiding the conversion of the pyroxyline into a condition suitable for applications in commerce or the arts.* And after referring to previous patents

obtained by him for solvents of pyroxyline, he proceeds to state that it is the object of his present invention to still further extend the list of substances which can be employed to dissolve or convert pyroxyline, or form with it useful combinations, and it is based upon a series of experiments in which he had demonstrated that *certain liquid members of the fatty-acid group of "ketones"* are useful solvents of pyroxyline, and can be employed in various ways, some of which are hereinafter described, in the manufacture of pyroxyline compounds for practical use. He distinguishes these members of the fatty-acid group of ketones from acetone, known as a practical solvent of pyroxyline, and he furnishes a list of the more prominent group of solvents, consisting of the simple ketones and of the compound ketones, acting as solvents of pyroxyline, all of which, he says, are known to chemistry as ketones derived from fatty acids, corresponding to the monohydric alcohols. He has furnished quite a full exposition of his methods of discovery of ketones in his application and preliminary statement.

There is really no great diversity of facts or complication shown in the proof; but the question would seem to be one rather of the construction of facts and the proper conclusion to be drawn therefrom. The examiner of interferences has furnished a very clear and fair summary of the evidence, showing the methods of experimental investigation of the parties in making their discoveries, and how they arrived at the results. And as we agree in his reasoning and conclusions, we can not do better than adopt his summary of the evidence. He says:

"In his preliminary statement Stevens alleges conception in January, 1890, and reduction to practice in June and July, 1890. In the testimony offered in support of his claim of priority the date of conception is fixed as of November 8, 1889, but under the well-settled practice he can not be accorded an earlier date than that set up in his preliminary statement. It appears that on November 8, 1889,

Stevens dictated to Mr. Axtell, a chemist in the employ of the Celluloid Manufacturing Co., the memorandum in evidence as 'Axtell memorandum,' wherein Axtell is instructed to produce members of the 'acetone family,' other than acetone itself, in order 'to further extend the list of useful solvents' of pyroxyline. On March 13, 1890, under instructions from Stevens, Axtell gave an order to Merck & Co., wholesale dealers in chemicals in New York City, for a large number of substances, among which were several of the ketones embraced within the limits of this controversy, viz., butyron (dipropyl ketone), di-ethyl ketone, methyl-ethyl ketone, methyl-hexyl ketone, methyl-propyl ketone, and valeron. Being unable at this time to procure these ketones—and in fact they were not received until December, 1890—Axtell, in June and July, 1890, proceeded to carry out the instructions of Stevens to produce the ketones and to examine them for solvent properties. Mr. Stevens was absent from this country from June 14, 1890, until late in the fall, and during his absence, in June and July, Axtell, as shown by his memorandum made on July 16, 1890, had succeeded in making valeron, propion, butyron, suberone, and phorone, and also some of the compound ketones resulting from the distillation of the fatty-acid salts of barium and calcium. He further states that he produced at this time the members of the group beginning with acetone or di-methyl ketone to methyl-nonyl ketone and from di-ethyl ketone (propion) to ethyl-nonyl ketone. These were tested at this time and found to be solvents of pyroxyline.

"Upon the return of Stevens from abroad, in the latter part of 1890, he personally took up the study of the ketones of the fatty-acid group, the results of which are shown in his memoranda of February 8, 1891. Being, as he states, extreme busy, he was unable to take up the subject again until April, 1892, when an elaborate series of experiments were conducted with a large number of the members of the

series which he had not before personally examined. The result of these experiments appears in Stevens' Record, pp. 88 to 107. Stevens is, however, entitled to carry the date of his discovery of the solvent properties of the ketones of the fatty-acid group higher than acetone—back to the investigations of Axtell in June and July, 1890. The idea that was original with Stevens was communicated to Axtell who carried out the instructions given, produced some of the members of the group of ketones suggested by Stevens, and by tests demonstrated their powers as solvents of pyroxyline. The record of Stevens presented in this case shows that prior to the filing of his application the ketones to which this controversy is limited had been thoroughly and exhaustively studied, and that he possesses a complete and comprehensive knowledge of the whole matter.

"In strong contrast to the case presented by Stevens stands that of Seher. He filed his application for patent December 28, 1891, and admits that he never tried a single one of the substances claimed by him in his patent to determine its property as a solvent of pyroxyline and can not state positively that he has ever seen any one of them. In view of this admission, the case of Seher is confined within comparatively narrow limits. The position taken on his behalf is that he used as a solvent of pyroxyline a certain oily liquid obtained in the distillation of wood alcohol, and also a portion of the distillate *arising from the distillation* of crude acetate of lime. It is contended that these bodies contained *only* the ketones named by Seher in his patent, and that when he used them to dissolve pyroxyline it followed as a matter of course that he made the invention in issue and reduced it to practice.

"In 1883 Seher was in the employ of Charles Cooper & Co., manufacturing chemists, Newark, N. J. At that time he was making acetone from wood alcohol, and the substance which he alleges he found to be a solvent of pyroxyline was an oily liquid passing over in the distillation of

the wood alcohol a little below 100° C., at which point the distillation was stopped. A small portion of this oily liquid he took to his home and after dehydrating (?) submitted it to distillation, using the distillate in his experiments. He states that the largest amount passed over between 95° and 140° C. Nothing further was done with this oily liquid until after August, 1887, as he considered it of no importance, and then it was, as he alleges, that he discovered that it consisted of ketones. He determined this by the fact 'that with the alkaline solution of iodine they would yield iodoform, and that with a dilute solution of hypochlorite of lime they would yield chloroform.' But it is a known fact, and Seher admits, that the iodoform and chloroform tests are in nowise indicative of the precise nature of this substance, much less that the product obtained by him contained nothing but the ketones named in his patent. There was no fractional separation and no analysis of any kind made to determine what this substance contained, and no definite information is given even of the boiling-point of the distillate that he used. In the absence of such proof and from the further fact that there is no corroboration of Seher as to anything alleged to have been done by him, and his own testimony was given solely from memory and after a lapse of ten years, it can not be found as a fact that the solvent power of this 1883 product was due *exclusively* to the ketones named in his patent, or that Seher had any knowledge that such was the fact.

"The next step taken by Seher in connection with the ketones of the issue was in 1887, when it is alleged he obtained a solvent containing such ketones by the destructive distillation of crude acetate of lime. This fact, however, if proved, can have no earlier date than that named in his preliminary statement, to wit, August 16, 1889. Seher was familiar at this time with the process described in the patent to Michaelis, No. 322,194, of July 14, 1885, for the manufacture of chloroform and of purified acetates, and he testi-

fies that he was experimenting with this process to determine the yield of acetone in order to produce chloroform. In the spring of 1887 he distilled a few pounds of crude acetate of lime, the several products being run over and collected together, which distillate he sent to Dr. Simon, a chemist in the employ of Cooper & Co., to be subjected to a fractional distillation in order to ascertain the yield of acetone. Dr. Simon testifies that he fractionated this substance and found that a part of it was acetone, but that the greater part had a boiling-point much higher than acetone. These fractions were put into bottles and labeled and delivered to the office. Seher states that he obtained these fractions, poured the liquids together, except the acetone, and put in some pyroxyline and found that it was dissolved.

"The witnesses Amend and Jarrett are brought forward to corroborate Seher in his allegation that he had this solvent in 1887, but their testimony proves nothing. They have no knowledge of their own as to what the substance was that it is claimed was shown them, and they admit that all they know about its constitution is what was told them by Seher. Amend's test of rubbing some of the liquid on the hand and smelling is of as little value as the iodoform and chloroform tests.

"Nothing more seems to have been done by Seher until a visit of Dr. Waldstein, *some time in 1889,* the precise date of which is in doubt. However, all that occurred at the time of this visit was the exhibition by Seher to Waldstein of a substance which the former said he had produced by the dry distillation of crude acetate of lime. The matter was not again reverted to until some time after August, 1890, when Waldstein's firm purchased an interest in Seher's factory, after which time it is alleged a large number of distillations were made. This, however, was subsequent to the date of Axtell's investigations.

"The difficulty with the testimony on behalf of Seher is that it is too vague and indefinite and lacks that exact in-

11 Ct. App.—18

formation which is of such importance when dealing with an art of this nature. Taking the evidence together, it falls far short of establishing the fact that the solvent which Seher had made consisted *exclusively* of ketones of this group higher than acetone, as the whole case rests upon oral testimony given after the lapse of several years and unsupported by a single note or memorandum of anything that is alleged to have been done. Dr. Simon, who made the fractional distillation in 1887, has no recollection of the number of fractions or even of the boiling-point of any one of them. Seher is equally as ignorant of these matters. He made no analysis of this substance and never became aware of its constituents.

"The only attempt at identification of this distillate was the iodoform and chloroform tests; but the fact that chloroform and iodoform can be made does not prove that the distillate contained ketones exclusively, much less that it contained nothing but the ketones named in Seher's patent.

"While it is undoubtedly true that by the dry distillation of crude acetate of lime Seher would obtain some, if not all, of the ketones named in his patent, it is equally true that he would obtain also other bodies. Thus acetone, the lowest member of this particular group, a powerful and well-known solvent of pyroxyline, is present in such distillate, and the naked allegation of Seher that he employed his solvent free of acetone can hardly be accepted as conclusive of the fact when we recall Simon's testimony, and the circumstances under which Seher testified, and the further fact that Seher never made any test to determine that the distillate was free of acetone; also Dr. Waldstein's testimony that he determined that no acetone was present by boiling some with a thermometer has no weight in view of the fact that he gives no information upon which he bases such a conclusion. Merely heating to the boiling-point of acetone, if this is what he did, would not remove all the acetone.

"Again, the distillate obtained by Seher undoubtedly con-

tained aldehydes, some of which respond to the iodoform and chloroform tests and which Dr. Waldstein claims are solvents of pyroxyline; but there is no evidence that these were removed, and hence it can not be said with certainty that the solvent action was due to the ketones higher than acetone, a small number of which Seher has named in his patent. This was the thing to be determined, assuming Seher's contention to be the correct one, not that some compound body obtained in the manner stated by him, of whose precise composition he was ignorant, was a solvent of pyroxyline.

"The examiner can not give his assent to the contention of Seher, that even if he had discovered that the product arising from the destructive distillation of crude acetate of lime was a solvent of pyroxyline that he thereby discovered that the ketones named in his patent *alone* were solvents. Seher has made no analysis of such substance and no separate tests of the solvent power of any of his named ketones. The discovery that such a compound body was a solvent does not justify the conclusion that each constituent of that body is a solvent, for the solvent power of the mixture might be due to certain ones and not to others, or to other constituents of whose presence he was ignorant, or to a certain mixture of two or more. One member of a group may be a solvent, and the next one, or one closely allied, not, an example of which is furnished by methyl and ethyl alcohol. The former is a solvent of pyroxyline and the latter is not.

"It was through Dr. Waldstein that Seher filed his application for patent. The former prepared the specification in December, 1891, and as he had never examined the product that had been obtained by the distillation of crude acetate of lime he resorted to Fehling's 'Handworterbuch der Chemie' for a list of ketones which he assumed would or ought to be present, and in so doing included methyl-valeral among the list, which is an aldehyde and not a ketone.

"Upon a review of the whole record the examiner feels justified in holding that Seher did not make the discovery that the ketones of the fatty-acid group higher than acetone are solvents of pyroxyline, at least prior to the date which has been accorded Stevens. The latter has fully sustained the burden upon him and is justly entitled to a patent, notwithstanding the grant to Seher."

On appeal to the board of examiners-in-chief that tribunal, upon full examination of the evidence, concluded with the examiner of interferences that "a discovery in the useful arts can not be made by conjecture, assumption, or reasoning; that it can only be attained by an accomplished fact. That it must be a discovery not of the mind, but by the actual use of physical means to develop a physical result. That the testimony had disclosed that Seher never made the discovery or discoveries set forth and claimed in his patent; and that Stevens made each and all of them, and is not merely the prior inventor of them, but is the first and only inventor of them."

From this decision Seher appealed to the Commissioner of Patents, and the Acting Commissioner reversed the decision and adjudged priority to Seher, and from which latter decision Stevens has appealed to this court.

The Acting Commissioner says that he has assumed that the statements made by the parties are true; that the statements made by Stevens are corroborated quite fully, and that there had been no very serious effort made to discredit the statements of Seher, and that such effort as had been made did not amount to a warrant for throwing any of them out, especially in view of Seher's position as patentee prior to the filing of Stevens's application.

The Acting Commissioner then proceeds to state the grounds of his dissent from the decisions of the examiner of interferences and of the examiners-in-chief. He says:

"Stevens asserts that Seher never made the invention for which he obtained a patent, and this is really the whole

question to be considered. There can be no reasonable doubt," says the Acting Commissioner, "but that Seher conceived substantially the solvent of the issue before Stevens, and the question is, whether what he did with it amounts to a reduction to practice anterior to Stevens's exhaustive researches. Neither Seher nor Waldstein, however, ever actually produced an individual ketone, and as such tried it as a solvent. It is true that Mr. Simon appears to have made a fractionation of the distillate from commercial acetate of lime sometime in 1887, but this fractionation, which was made before the date of Seher's alleged disclosure, was not carried so far, apparently, as to separate out the individual ketones, and these fractions were not tried by Seher separately, but were poured together, and with the resultant mixture Seher made a test for dissolving pyroxyline.

"Seher never tried any individual ketones as solvents. He never deliberately and definitely tried any two or more, although he certainly tried mixtures of them. Stevens tested numbers of them individually, and tested some in combination with other solvents; but that he tested all possible combinations of these ketones with each other, and with other solvents, is not stated, and would be, in fact, entirely improbable.

"These two men" says the Acting Commissioner, "approached the question of dissolving pyroxyline from different points. Seher was trying to get a cheap and efficient solvent, no matter what it was. Stevens was trying to ascertain how many solvents he could discover, and the characteristics of all such solvents. One approached the question with the instincts of a business man, the other with the instincts of a scientist. Seher's discovery was in a measure accidental; Stevens's, the inevitable result of an exhaustive system of experiments. One took a comparatively cheap material—crude acetate of lime—for the source of his solvent; the other tried expensive and little known chemicals, but neither ever made a complete reduction to practice of

the issue in the sense of having made solutions of pyroxyline in ketones in all the variations possible under it.

"Stevens states that he reduced the invention to practice in June and July, 1890.   At that time he was in Europe, but Mr. Axtell, from June 20 to July 15, acting under his direction, produced 'various ethereal liquids which are strong solvents of soluble pyroxyline.'   These liquids he identified with more or less certainty, and they were obtained by 'distilling various mixtures of the fatty-acid salts of barium and calcium.'   Seher had previously distilled such a salt and had produced at least one such solvent, but had not established by analysis or fractionation the composition of said solvent.

"I cannot agree," says the Acting Commissioner, "with the statement of the examiners-in-chief that Seher never made the disclosure set forth and claimed in his patent, and I can not reconcile this statement with the presumption, which necessarily follows therefrom, that Stevens did make all the discoveries possible under his claim.   Seher discovered a solvent for pyroxyline.   That solvent is the one covered by the issue.   He did not by chemical analysis show absolutely the composition of such solvent, but from tests which he and others made, and from consultation with authorities, he came to a reasonably accurate knowledge of its character.   That he was aware of the whole scope of his discovery does not seem probable, but he was in a position earlier than Stevens to give to the world the essential features of the issue to an extent sufficient to meet the requirements of practical working, and the progress of science and the useful arts is promoted effectively when an inventor meets such requirements."

He therefore reversed the decision of the examiners-in-chief, and adjudged priority in favor of Seher;—holding that Seher had discovered and disclosed his invention prior to June or July, 1890, the time when it is conceded Stevens had completed and reduced to practice the invention or

discovery of the issue, and which time was prior to the date of Seher's application for his patent. The patent has only *prima facie* effect on this interference, and is subject to be rebutted.

But on the facts taken as true by the Acting Commissioner, we think the conclusion reached by him should have been the reverse of what it was. It is clear, we think, that, on the proof, the claim of Seher is not sufficiently and definitely established to maintain his patent,—it having, as it can have, only *prima facie* effect; that he has failed to show that he has fully and completely established by experimental tests, so as to enable persons reasonably skilled in the science of chemistry to determine whether or not the composition made and claimed by him as new and valuable in the arts really possesses those properties which he claims as the essential character as an operative means; for no invention or discovery in such case as the present can be regarded as complete until such tests have been applied and have been successfully maintained. Rob. on Pats., Sec. 198. This is a principle settled and insisted upon in all the cases. In a case like the present, the patent should state and fully disclose the component parts of the composition claimed with clearness and precision, and not leave a person attempting to use the discovery to find it out by experiment. If the description be so vague and uncertain that no one can tell with certainty, except by independent experiment, how to apply the discovery and what exact result may be expected therefrom, the patent is void. *Wood* v. *Underhill,* 5 How. 1, 5; *Tyler* v. *Boston,* 7 Wall. 327, 330; *The Incandescent Lamp Patent,* 159 U. S. 465, 474–5.

We entirely agree with the Acting Commissioner that, upon the evidence, it is clear, neither Seher nor Waldstein *ever actually produced an individual ketone, and as such tried it as a solvent.* The fractionation made by Simon of the distillate from commercial acetate of lime was not carried so far as to separate out the individual ketones; and such fractions were

not tried by Seher separately, but were poured together, and with the resultant mixture Seher made a test for dissolving pyroxyline. As said by the Acting Commissioner, Seher never tried any individual ketones as solvents. He never deliberately and definitely tried any two or more, although he did try mixtures of them. Seher never did by chemical analysis show with positive certainty *the composition of any such solvent as he supposed he had discovered, and the relative component parts thereof,* but he arrived at his conclusion by what he supposed to be a reasonable deduction from the experiments that he had made. This is not sufficient.

Concurring fully with the reasoning and conclusion of both the examiner of interferences and the examiners-in-chief, we must dissent from the conclusion of the acting Commissioner, and therefore reverse the decision appealed from.

The clerk of this court will certify this opinion and the proceedings in the cause to the Commissioner of Patents, to be entered of record in his office, according to law; and it is so ordered.

*Ruling appealed from reversed.*