## M. SWIFT & SONS, Inc., v. W. H. COE MFG. CO.

### No. 531.

District Court, D. Rhode Island.
March 7, 1938.

Horatio E. Bellows, of Providence, R. I. (Nathaniel Frucht, of Providence, R. I., of counsel), for plaintiff.

Barlow & Barlow, of Providence, R. I. (Henry J. Lucke, of New York City, of counsel), for defendant.

MAHONEY, District Judge.

M. Swift & Sons, Inc., the complainant, has brought this suit in equity arising under the patent laws of the United States against W. H. Coe Manufacturing Company, the respondent. It involves the alleged infringement of United States letters patent No. 1,974,883, issued on the 25th day of September, A.D.1934. The complainant owns the patent by assignment from Donald D. Swift, the alleged inventor. It seeks to enjoin the respondent

for alleged infringement of its patent, and prays for an accounting of profits, and for damages.

The invention has to do with "an improved gold or metallic leaf sheet or ribbon, for use in the imprinting of ornamentation of leather, cloth, or other surfaces."

The specification states that: "In manufacturing the novel product, a carrier strip 1 of paper or other suitable flexible material is provided, glassine paper being preferred, and a coating 2 of a combined adherent and burnishing material is placed on the face thereof, the preferred material being a wax such as beeswax. Over this coating a layer 3 of gold or metallic leaf is applied, and a final coat 4 consisting of an intimate mixture of sizing 5, such as French varnish, and a filler material 6, the most suitable material being yellow ochre. This base is preferably paper, but may be of other suitable flexible material, such as metal foil."

The specification further states that: "It is customary to utilize gold or metallic leaf sheets or ribbons for stamping, embossing, and ornamenting compressible surfaces such as leather, cloth, and the like, in order to reduce the number of operations required, to facilitate the application of the metallic leaf to delicate material, and to place the metallic leaf and the sizing therefor in a sales package that does not require excessive care and attention. The metallic leaf ribbons now in use thus include a carrier strip of paper having a coating of beeswax, on which a layer of metallic leaf is placed, a sizing coat of varnish or the like being placed on the layer of metallic leaf.

"It has been found that the ribbons of this type, while suitable for good leather and other material capable of forming a satisfactory base for the metallic leaf, do not produce satisfactory results on leathers of poorer grade that are coarse, porous, or resilient, or on imitation leathers that are impregnated with pigments or fillers susceptible to heat, or on fabrics that have resilient threads or that do not properly set off the thin metallic leaf. It is the principal object of my invention to improve the metallic leaf sheet or ribbon so as to produce a more perfect imprinting or ornamentation upon such materials, as well as the better materials."

It is also stated in the specification that the inventor has devised "a novel method of manufacture of a novel metallic leaf sheet or ribbon, which may be used in place of the present type, but which includes additional matter to coact with the material to be imprinted or ornamented so as to overcome the deficiencies of the material and to enhance the appearance and the life of the imprinting or ornamentation."

The claims in issue are 3 and 5, and the complainant claims infringement of them.

They are as follows:

"3. A metallic leaf sheet comprising a carrier strip, a coat of releasable composition thereon, a layer of metallic leaf on said coat, and an outermost layer comprising sizing containing a substantial amount of comminuted particles of substantially the same color as the color of the metallic leaf."

"5. A gold leaf sheet comprising a carrier strip, a coat of wax thereon, a layer of gold leaf on said coat, and an outermost layer of sizing containing a substantial amount of comminuted yellow ochre."

The respondent denied the validity of the patent, and the alleged infringement. It averred that Donald D. Swift was not the first inventor of any material and substantial part of the result patented. It further alleged anticipation of the invention by a number of patents and publications in this and in foreign countries. Also as a defense, it is alleged that the patent in suit does not constitute a patentable invention, and that, for more than two years prior to the date of the patent application, an article embodying the material and substantial part of the said patent was manufactured, used, and sold in the United States to the knowledge of the complainant and the said inventor. The defense of laches also is pleaded.

The facts and conclusions appearing herein may be adopted as findings of fact and conclusions of law, in accordance with the provisions of Equity Rule 70½, 28 U.S.C.A. following section 723.

The alleged infringement is the sale by the respondent, W. H. Coe Manufacturing Company, of a specified article allegedly protected by the patent.

The alleged invention has met with considerable commercial success.

A determination of the validity of the patent is the first consideration presented.

The rights arising from inventions are based on statute. 35 U.S.C.A. § 31. To obtain these rights it is necessary to

comply strictly with the terms of the statute. Upon the issuance of the patent by the Patent Office a presumption of the validity arises, and the patent then is prima facie evidence of patentable invention. A denial of such validity carries with it the burden of sustaining such denial by proof beyond a reasonable doubt. The evidence must be clear and convincing. Has the respondent produced such evidence and has it maintained the burden of proof necessary?

On June 29, 1933, application was made for the patent in the present case. The patent is dated September 25, 1934. The claims contain the language—"and an outermost layer comprising sizing containing a substantial amount of comminuted particles of substantially the same color as the color of the metallic leaf"—and "an outermost layer of sizing containing a substantial amount of comminuted yellow ochre." In 1929 the American Embossing Foil Company made and sold a metallic leaf which had a layer of sizing, in which sizing was yellow ochre. It is clear from the evidence that the practice followed by the American Embossing Foil Company in 1929 was the same practice employed by Mr. Robertson while working with Mr. Donald Swift in 1933. Mr. Robertson had been familiar with the use of yellow ochre in the outer sizing of bronze powder roll leaf as a pigmented sizing. And now he applied yellow ochre in the sizing and put it in the genuine gold leaf. He followed the practice in which he had engaged in applying yellow ochre in the sizing of imitation roll leaf. This practice was known to Mr. Donald Swift, the assignor of the patent, at the time application was made for the patent. Nothing in the patent reveals any definite proportions of yellow ochre in the outer sizing. Therein the patent does not differ from the practice employed by the American Embossing Foil Company in 1929 and earlier.

From the history of the prior art in supplying the trade with metallic roll leaf, it is clear that the use of metallic leaf sheets having fillers of many kinds in the outer sizing was old. A large and varied number of comminuted fillers in the outer sizing of metallic leaf sheets was used by the Peerless Roll Leaf Company continuously in its productions for several years up to the time that the patent was issued. The filler mixed with the sizing of the patent in suit is not such a filler as amounts to invention which is patentable, nor is the use of it in the manner prescribed in the claims such as amounts to patentable invention. It is not a real advance over the prior art. The proof of this is clear and convincing.

In the cause entitled Peerless Roll Leaf Company, Inc., v. Lange et al., 3 Cir., 20 F.2d 801, 802, the court, speaking of the patents there, said:

"The plaintiff maintains that the Grupe patent is a primary or basic patent and lies at the foundation of the modern commercial roll leaf industry, claiming that it has five important results which are that chalk or its equivalent, being present in the sizing in the form of myriads of microscopic marbles, (1) operates as a mirror upon light passing through the thin metallic leaf to increase its lustre; (2) affords an opaque screen to block out the color of the article embossed; (3) fills the coarse grain of the fabric embossed; (4) has a heat-retarding effect to produce clean-cut edges of the embossed design; and (5) becomes a shield against tarnishing and discoloring the metallic leaf by chemicals from the article embossed. That the alleged invention was not the foundation of the commercial roll leaf industry is evidenced, we think, by the fact that transfer leaf in rolls was in use, patented and in litigation before the conception of either of the inventions of the patents in suit; and while chalk and rice starch may produce the five results claimed, it is equally true that the same results were obtained in like or different degree by other ingredients in the prior art. * * *

"Evidently the Grupe patent or the Boyd patent cannot be infringed unless it is valid and, if valid, it is only because it involves invention and then only if the invention be patentable in that it points out a filler to be admixed with the sizing that is new and useful in the sense of being a real advance over what the art already had. It seems to us that the art had about everything already. It had French chalk dusted on the article to be embossed; dextrin, a derivative of starch; metallic powder; talcum; color pigments; bicarbonate of soda. It had starch variously placed and applied; wheat flour; calcium; pulverized whiting and resin. These fillers varied in some of their functions and perhaps in degrees of excellence in giving lustre and obtaining sharp cleavage. Yet

the art is so full of fillers and the idea of fillers has been so long found in the art that we cannot think the disclosure of chalk or rice starch as a filler amounts to invention."

For these reasons the patent in suit is invalid.

Present in this case is a further condition which is destructive of the validity of the patent. Under the statutory provisions of the patent law, the inventor receives a grant of a patent. This is given to him as compensation for the fruitful exercise of his inventive genius in producing something of useful value in the art. It confers upon him certain rights and privileges. These are monopolistic in their scope. The grant gives to him, or his assignee, the exclusive right to manufacture, sell, and use the patented produce of his inventive ability with the accompanying denial of the right of the public to manufacture, sell, or use the same for a fixed period of time, without the license of the inventor, or his assignee. Because these rights and privileges are so granted to the inventor, or his assignee, the patent itself must be particularly definite and certain in its terms. It cannot be so elastic in its nature that it may be stretched beyond its exact and concise terms. It must make its disclosure and teaching so clear and concise that one skilled in the art may make, construct, and use the same from the revelation set forth in the patent. Something more than is revealed cannot be claimed. The patent must teach something in return for the exclusive rights the inventor receives.

The patent law requires that the applicant for a patent file a "written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same." 35 U.S.C.A. § 33.

It is set forth in the evidence that specified amounts of yellow ochre in the outer sizing are used in obtaining the results desired by the use of the patent, and that an extender with yellow ochre as the filler of outer sizing is used.

This does not appear in the patent itself.

At once it is demonstrated that the patent, in the language set forth in the claims—"substantial amount of comminuted particles of substantially the same color," and "substantial amount of comminuted yellow ochre"—does not contain a written description as required by the statute. Upon a reading, one skilled in the art could not make and use it; could not obtain the desired results; could not know the proper proportions to use without experimentation.

In the Incandescent Lamp Patent, 159 U.S. 465, at page 474, 16 S.Ct. 75, 78, 40 L.Ed. 221, the court recited that: "It was said by Mr. Chief Justice Taney in Wood v. Underhill, 5 How. 1, 5, [12 L.Ed. 23], with respect to a patented compound for the purpose of making brick or tile, which did not give the relative proportions of the different ingredients: 'But when the specification of a new composition of matter gives only the names of the substances which are to be mixed together, without stating any relative proportion, undoubtedly it would be the duty of the court to declare the patent void. And the same rule would prevail where it was apparent that the proportions were stated ambiguously and vaguely. For in such cases it would be evident, on the face of the specification, that no one could use the invention without first ascertaining, by experiment, the exact proportion of the different ingredients required to produce the result intended to be obtained. * * * And if, from the nature and character of the ingredients to be used, they are not susceptible of such exact description, the inventor is not entitled to a patent.'"

From a reading of the specification and claims of the patent, and an examination of the testimony, it is clear that the written description of the invention and of the manner and process of making and using it, required by the statute, does not contain such "full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is mostly nearly connected, to make, construct, compound, and use the same."

The emphasis placed upon the commercial success of the alleged invention cannot cure its invalidity. It is only in cases where the validity of the patent is in doubt that commercial success may determine its validity. Where the patent is invalid, such success cannot bring to the alleged invention the patentability which is required for its validity.

The defense of invalidity is sustained. A consideration of the defense of laches is unnecessary.

The bill of complaint is dismissed.