**M. SWIFT & SONS, Inc., v. W. H. COE MFG. CO.**

**No. 3394.**

Circuit Court of Appeals, First Circuit.

March 2, 1939.

Nathaniel Frucht, of Providence, R. I. (Max Schwartz, of Providence, R. I., on the brief), for appellant.

Henry J. Lucke, of New York City (Herbert B. Barlow, of Providence, R. I., on the brief), for appellee.

Before BINGHAM and WILSON, Circuit Judges, and PETERS, District Judge.

WILSON, Circuit Judge.

This is an appeal from a final decree of the District Court for the District of Rhode Island dismissing the plaintiff's bill in equity alleging infringement of Patent No. 1,974,883 issued to Donald D. Swift on September 25, 1934, on an application filed June 29, 1933, and assigned by Donald D. Swift to the plaintiff by assignment duly recorded in the United States Patent Office.

The M. Swift & Sons, Inc., is a Connecticut corporation, and the W. H. Coe Manufacturing Company is a Rhode Island corporation. These corporations will be hereinafter referred to as plaintiff and defendant respectively.

The subject matter of the patent in suit relates to the manufacture of gold or other metallic media for the imprinting of letters on and the ornamentation of leather articles, book backs and sides, cloth and other like surfaces.

The imprinting art has from time to time developed new materials, both natural and synthetic, suitable for book covers, bill folds and note books, but many of these new materials could not be successfully imprinted with genuine gold leaf because of the nature of the material. This increase in new material for such uses created new problems, which the prior practice did not solve, and which the patentee Swift claims his invention provided a simple and effective solution.

The art of beating gold into leaf form is very old, but the imprints of gold leaf on certain materials, as leather, cloth and other materials, has increased with the modern development of the industry. The application of genuine gold leaf to new materials has resulted in many new problems. Owing to the thinness of the gold leaf when drawn out for imprinting, pinholes or punctures develop in the leaf, due to the metal being worked beyond its elastic limit. Another defect would sometimes appear, known as "foxy gold", which shows a reddish tinge and appeared like a stain on the surface of the leaf.

Prior to 1891, when Patent No. 461,-861 was issued to Mr. Coe, the founder of the defendant corporation, the process used by the gold leaf industry had the dis-

advantages of loss of time, and needless consumption of gold leaf for each operation. The Coe patent was the first major step for overcoming these disadvantages. This patent covered a machine for applying gold leaf by cutting the leaf into strips and imprinting the gold leaf strips under a heated die upon sized material.

The Coe reissue patent No. 11,510, based on the original patent and issued in 1893, laid the basis for gold leaf strips in "roll form" that was suitable for ordinary commercial uses, but difficulty was still experienced when applying the gold leaf to smooth or uneven surfaces. Coe recognized these difficulties when he applied for his patent No. 548,113, in which he states in his application:

"I have found in practice that such a roll is not adapted for use in applying the film to the surface of glass upon which a comparatively weak water sizing must be employed, rendering the withdrawal of the film from the strip and its proper adhesion to the glass very uncertain and also that the said roll is not adapted for applying the film to uneven surfaces, for the reason that the film will only be attached to the higher points of the said surface."

The next important step in advance in the art was made in 1915, when one Davis obtained a patent which forms the basis for the present day metallic strips. It provided for a paper carrier, yellow beeswax on the carrier, gold leaf next to the yellow beeswax and a clear varnish sizing applied on the outside of the gold leaf.

Between 1915 and the application by Donald D. Swift for his patent on June 29, 1933, the use of imprinted gold leaf had increased, and various types of imitation leathers and cloths came into use as materials on which to imprint gilt letters, figures and ornamental designs. It was difficult and sometimes impossible to imprint on the new imitation leathers and some of the better synthetic leathers, and even genuine leather, if the surface were rough and pebbly, which caused the very thin gold leaf to break and separate.

This expansion of the art created an incidental and companion art, which involved the use of low cost imitation gold, silver, and the use of powdered bronze as a substitute for genuine gold leaf. It was soon discovered, however, that bronze powder tarnished very rapidly and that imitation gold could only be used on cheap articles. Manufacturers soon realized that it

was necessary to devise some way for the bronze to retain its lustre for longer periods of time. The first attempts to remedy this defect used various chalks, clays and other separators by introducing them into the outer varnish sizing to act as a layer between the bronze powder and the article to be imprinted.

Two patents were issued in 1925, viz.: The Boyd Patent, No. 1,515,722, in which starch was used as the separator, and the Grupe Patent, No. 1,515,676, in which powdered chalk was used for the same purpose over bronze powder, both of which were held invalid. Peerless Roll Leaf Co., Inc., v. Lange, 3 Cir., 20 F.2d 801. The American Embossing Foil Company used an oxide separator in place of the starch and chalk of Boyd and Grupe, or a low cost yellow ochre. However, the use of bronze powder as the metallic leaf and a separator did not obviate the defect and it retained its lustre a very short time as compared with the use of genuine gold as the metallic leaf.

This was the state of the prior art when the alleged Swift invention was placed on the market. The prior development of the roll carrier by Coe, or by the Peerless Roll Leaf Company, had emphasized the defects in the use of gold leaf, which have already been pointed out. Donald D. Swift in 1931 began to experiment with a view to correcting the inherent defects of genuine gold when used in the art as a "metallic leaf" in order to obtain a finished product of uniform color, texture and appearance; and in the course of his experiments, which covered a period of nearly two years, he discovered that yellow ochre in the proper amount, when mixed with the sizing, furnished a good bed for the genuine gold metallic leaf.

With the assistance of one Robertson, a former employee of the American Embossing Foil Company, who was skilled in the mixing of pigments in the sizing over bronze powder, they discovered that by the use of yellow ochre mixed with the outer sizing, they were able to use genuine gold leaf successfully on much of the new material which had come into use since the turn of the century, and in June, 1933, Swift applied for his patent now in suit.

The specification of his patent describes the manufacture of the product as follows:

"In manufacturing the novel product, a carrier strip 1 of paper or other suitable flexible material is provided, glassine paper

being preferred, and a coating 2 of a combined adherent and burnishing material placed on the face thereof, the preferred material being wax, such as beeswax. Over this coating a layer 3 of gold or metallic leaf is applied, and a final coat 4 consisting of an intimate mixture of sizing 5, such as French varnish, and a filler material 6, the most suitable material being yellow ochre."

The only advance over the prior art was the use of yellow ochre in the outer sizing.

Donald D. Swift's application for a patent contained seven claims on which his patent was based, but subsequent to the filing of the defendant's answer the plaintiff elected to rely on Claims 3 and 5 in the trial in the District Court.

It appears that the plaintiff's invention as stated in Claim 3 consisted of a carrier paper, a beeswax covering, genuine gold leaf with an outer sizing with which was mixed a "substantial" amount of yellow ochre. Claim 3 reads as follows:

"A metallic sheet comprising a carrier strip, a coat of releasable composition thereon, a layer of metallic leaf on said coat, and an outermost layer comprising sizing containing a substantial amount of comminuted particles of substantially the same color as the color of the metallic leaf."

This claim obviously is limited to the mingling with the sizing comminuted particles having substantially the same color as the color of the metallic leaf.

Claim 5, the only other claim in suit, is as follows:

"A gold leaf comprising a carrier strip, a coat of wax thereon, a layer of gold leaf on said coat, and an outermost layer of sizing containing a substantial amount of comminuted yellow ochre."

Under these two claims, the plaintiff contends that the patent describes a new product not known or used before in the art and which constituted an improvement over the clear sized gold leaf described in the patent to Davis in 1915.

The validity of the plaintiff's patent is attacked by the defendant chiefly on two grounds: (1) that it was insufficiently described in the patent; (2) that it was anticipated in the prior art, either of which, if sustained, is fatal to the validity of the patent.

Sec. 4888, R.S., 35 U.S.C.A. § 33, requires that an invention to be valid must be clearly, concisely and exactly described so that anyone skilled in the art can use it by determining the combination, if made up of two or more constituents and the relative and proportionate parts of each; but the only description in the Swift patent of the amount of yellow ochre to be mixed with the sizing was a "substantial" amount without specifying the exact amount of the yellow ochre to be used in the combination and left that to be determined by experiments.

The District Court, under R.S. § 4888, held all the claims of the patent in issue, including 3 and 5, were invalid for insufficiency of disclosure and for lack of invention and dismissed the bill.

The District Court found, since the patent does not specify the amount of yellow ochre used in the outer sizing, unless an "extender" is used explaining the amount of yellow ochre needed, that therefore "upon a reading, one skilled in the art could not make and use it; could not obtain the desired results; [and] could not know the proper proportions [of yellow ochre] to use without experimentation." [22 F.Supp. 527, 530.]

■■ However, it is urged that the defense of insufficiency of description of the patent was not before the court, since it was not raised in the answer. In a suit in equity, a defense not set up in the answer will not be considered. No doubt this defense, if relied on, under Sec. 4920, R.S., 35 U.S.C.A. § 69, should have been set up in the answer. Jennings v. Pierce, Fed. Cas. No. 7283; 48 C.J., page 350, Sec. 564.

However, the plaintiff's witness, Donald D. Swift, the alleged patentee, testified that he did not know and could not give the proportions of yellow ochre used to produce the results he claimed for his invention. If evidence had been offered by the defendant and had been objected to by the plaintiff tending to show that the amount of yellow ochre in the outer sizing was not concisely and exactly stated in his patent, it would have been inadmissible. But no objection was made to the statement by Swift, the patentee, which appears in his own testimony as follows:

"In order to vary the pigment in the outer sizing in accordance with the tone of the gold of the metal layer, in order to

obtain the invention of the patent in suit, there is still the additional factor, namely, that the proportion of that yellow ochre in the outer sizing must be in sufficient quantity to carry out those results, namely to compensate for the irregularities of the metal, compensate for the irregularities of the product to be stamped, and the other factors which I mentioned."

The plaintiff's expert, Wickwire, also testified:

"The art of gold stamping, particularly with gold leaf, is far from an exact science. The different materials to be stamped upon require different methods. Different manipulations require also a good deal of skill. We have never—that is the Peerless Roll Leaf—have never been able to find any one combination of products in a roll leaf which can be used with great success universally on all materials to be stamped on. It is therefore necessary at the present time, and has always been necessary, in my experience with the company, to depend and rely upon our salesmen and representatives for practical and actual contact with the jobs which our customers were to stamp and largely to recommend different and specific sizings and other properties of leaf which will best suit the conditions of the job to be done by the customer."

According to Swift, the irregularities of the product to be stamped are determined primarily by the material on which the stamping is to be done. As testified by him:

"When a stamper wishes to stamp different material, for instance, the different materials that were shown this morning, like regular leather, artificial leather, buckram, foil and materials of that kind, the stamper must know in advance what kind of leaf he wants in order to obtain the results which are obtained in accordance with the patent here in suit." Further, "the sizing must be in correct balance to meet the requirements of the stamper. In order to have the proper roll leaf in accordance with this patent, the stamper must know what material he is going to use it with in order to carry out my invention."

The patent in suit is wholly silent as to any statement of quantity or proportion of yellow ochre in the outer sizing of the plaintiff's metallic leaf product. This, also, is admitted by plaintiff in his cross examination:

"I am familiar with the patent which is here involved in this suit. I have read it. The patent does not point out definite proportions of yellow ochre to be used in the outer sizing to obtain the results I enumerated."

In recross examination he stated:

"The amount of yellow ochre necessary is such that will co-operate with the gold to compensate for the irregularities in the leaf or to make the product more salable; to co-operate with the leaf in compensating for the transparencies of the leaf and to compensate for the irregularities of the material to be imprinted. That is the best answer I can give you. The entire patent indicates the results obtained. I have already stated that the patent does not disclose any definite proportion.

Without this extender and using yellow ochre only, you merely get the color of yellow ochre when the thing is viewed before it is stamped. The ribbon leaf under my patent containing a certain proportion of yellow ochre without an extender has some yellow color of some kind. To get a color other than yellow, you have to use this extender. The use of that extender is under this patent. The extender may be titanium oxide. I don't believe that titanium oxide is mentioned in the patent."

It is clear from the evidence that different materials require different proportions of yellow ochre in the outer sizing of the gold leaf; and since under Sec. 4888, R.S., it is essential to the validity of the plaintiff's patent that the amount of yellow ochre for different materials be disclosed correctly and accurately to the trade, only by such an extender, the contents of which the District Court did not require the plaintiff to disclose on the ground that it was a trade secret—the inference being that the proportionate amount of yellow ochre necessary in any case is made to appear therein—can the charge of insufficiency of the description of the patent be met.

The admissions of the plaintiff made it plain that it is impossible to set out even a typical detailed specification for effecting the patent in suit for all materials to be stamped. The subject matter of the invention appears clearly to come within the purview of Chief Justice Taney's classic ruling in Wood v. Underhill, 5 How. 1, at page 5, 12 L.Ed. 23:

"But when the specification of a new composition of matter gives only the names of the substances which are to be mixed together, without stating any relative proportion, undoubtedly it would be the duty of the court to declare the patent to be void. And the same rule would prevail where it was apparent that the proportions were stated ambiguously and vaguely. For in such cases it would be evident on the face of the specification, that no one could use the invention without first ascertaining by experiment the exact proportion of the different ingredients required to produce the result intended to be obtained. * * * And if, from the nature and character of the ingredients to be used, they are not susceptible of such exact description, the inventor is not entitled to a patent."

In Tyler v. Boston, 7 Wall. 327, 330, 19 L.Ed. 93, the court said:

"Now a machine which consists of a combination of devices is a subject of invention, and its effects may be calculated a priori, while a discovery of a new substance by means of chemical combinations of known materials is empirical and discovered by experiment. Where a patent is claimed for such a discovery, it should state the component parts of the new manufacture claimed with clearness and precision, and not leave the person attempting to use the discovery to find it out 'by experiment.'"

This is also true if there is a physical combination of materials upon the exact proportions of which the success of the alleged patent depends.

In Howard v. Detroit Stove Works, 150 U.S. 164, 14 S.Ct. 68, 69, 37 L.Ed. 1039:

"The description of the invention is vague and indefinite, and is not sufficient to enable those skilled in the art to construct it without experiment so as to attain the desired result. The width of the flange is a mere matter of degree, and if at the time of the invention the proper width of the flange to accomplish the purpose desired was known, then the patentee made no invention. If the proper width was not known at that time, it should have been described in the patent; but, as the patent is silent on this point, except that the drawings indicate that the width of the outside rim of the grate is the proper width for the flange, it can hardly be said under such circumstances that the vague and indefinite description of the width of the flange elevates it to the dignity of invention, for it has been shown that the stoves covered by the patents just discussed also had each a flange which performed the same function, although not specifically claimed in the patents. We think it is obviously apparent that the patent of appellants' testator has not only been anticipated, but that it is wanting in all of the elements of patentable novelty."

And in the Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 78, 40 L.Ed. 221, the court said:

"It is required by Rev.St., § 4888, that the application shall contain 'a written description of the device, and of the manner and process of making, constructing, compounding, and using it in such full, clear, concise, and exact terms as to enable any person, skilled in the art or science to which it appertains or with which it is most nearly connected, to make, construct, compound, and use the same.' The object of this is to apprise the public of what the patentee claims as his own, the courts of what they are called upon to construe, and competing manufacturers and dealers of exactly what they are bound to avoid. Grant v. Raymond, 6 Pet. 218, 247 [8 L.Ed. 376]. If the description be so vague and uncertain that no one can tell, except by independent experiments, how to construct the patented device, the patent is void."

Also see H. Ward Leonard, Inc., v. Maxwell Sales Corp., 2 Cir., 252 F. 584, 590; Rohm et al. v. Martin Dennis Co., 3 Cir., 263 F. 388.

Mr. Justice Brandeis, in speaking for the Supreme Court in Permutit Company v. Graver Corp., 284 U.S. 52, at page 60, 52 S.Ct. 53, at page 55, 76 L.Ed. 163, said:

"The statute requires the patentee not only to explain the principle of his apparatus and to describe it in such terms that any person skilled in the art to which it appertains may construct and use it after the expiration of the patent, but also to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not."

While the plaintiff in support of its contention that the language of Claims 3 and 5 are sufficient to comply with Sec. 4888, R.S., cited the case of Minerals Separation Syndicate v. Hyde, 242 U.S. 261,

270, 271, 37 S.Ct. 82, 61 L.Ed. 286, which on first blush might seem to sustain his contentions, an examination of the cases cited in the opinion in that case by the court at once indicates that it was not the intention of the court to overrule the cases above cited, or to disregard the clear requirements of R.S., § 4888; and an examination of the opinion and the evidence in the case discloses that there were many investigators at work in that case on the preliminary investigations, which resulted in that patent. The court, in its opinion on page 271, 37 S.Ct. on page 86, said:

"Yet the investigations preceding were so informing that this final step was not a long one, and the patent must be confined to the results obtained by the use of oil within the proportions often described in the testimony and in the claims of the patent as 'critical proportions,' 'amounting to a fraction of 1 per cent on the ore,' and therefore the decree of this court will be that the patent is valid * * *."

There was no such definiteness in the instant case as to the amount of yellow ochre to be used in the outer sizing of the plaintiff's alleged patent, nor any limits within which the amount of yellow ochre must be confined, since the patentee, Swift, admitted in his cross examination that he could not give any percentage of yellow ochre necessary to secure the desired results. It could, therefore, only be determined by experimentation.

In Ives et al. v. Hamilton, Ex'r, 92 U.S. 426, 431, 23 L.Ed. 494, cited in the Minerals Separation case, there were diagrams of the patent to assist one skilled in the art in the use of the patent; and in Mowry v. Whitney, 14 Wall. 620, 20 L.Ed. 860, there was a maximum and a minimum degree of heat to be applied to a wheel, which, in view of the specifications, was held to be a sufficient description of the patent.

The plaintiff in its reply memorandum also cited a case in the Eighth Circuit recently decided, General Electric Supply Corp. v. Maytag Company, 100 F.2d 218, where it claims this question was decided; but the quotation from the opinion in that case shows that, "although the word 'substantial' was used in describing the patent, it must be considered in connection with drawings and specifications and the earlier devices; and so considered we think they were sufficient, citing Eibel Process Co. v. Paper Co., 261 U.S. 45 [43 S.Ct. 322, 67 L.Ed. 523]."

■ If manufacturers and competitors of the plaintiff by experiment or analysis have found the amount of yellow ochre necessary to make the patent as described available for commercial use, and have put it on the market in the convenient form of a metallic roll in which the outer sizing is mixed with some material of substantially the same color as the metallic leaf, or with comminuted yellow ochre in a "substantial" amount and sufficient to achieve the results claimed by Swift for his alleged invention, any unusual acceptance and success of the metallic roll manufactured and sold by the plaintiff or its competitors to the trade is hardly indicative of a new and novel discovery by the patentee, if the patent is invalid for want of sufficiency in the description to enable one skilled in the art to use it without experimentation. Extensive commercial use or success is without any weight to prove invention, if the alleged invention is not sufficiently described in the patent. Where there is no invention the extent of the use is of no importance. Keene v. New Idea Spreader Co., 6 Cir., 231 F. 701, 711; Boss Mfg. Co. v. Thomas, 8 Cir., 182 F. 811, 814; McClain v. Ortmayer, 141 U.S. 419, 429, 12 S.Ct. 76, 35 L.Ed. 800; Adams v. Bellaire Stamping Company, 141 U.S. 539, 542, 12 S.Ct. 66, 35 L.Ed. 849.

■■ A determination of the issue of infringement by the defendant is not essential to a decision of this case, as an invalid patent can not be infringed; neither is it necessary to consider the plaintiff's other assignments of error, or the defense of anticipation, as a patent which lacks validity for want of a sufficient description is not affected by anticipation.

The decree of the District Court is affirmed with costs.